IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

CHARLOTTE A. STRICKLAND                                                PLAINTIFF

V.                                       NO. 09-1028

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration                         DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Charlotte A. Strickland, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner), denying her claims for a period of disability and disability insurance benefits under Title II of the Social Security Act (the Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**Procedural Background**

Plaintiff protectively filed for disability insurance benefits on September 29, 2004, alleging disability since February 9, 2001.[1] (Tr. 541). Plaintiff's applications were denied initially and on reconsideration. (Tr. 52, 60-62, 53, 56-57).[2] Pursuant to Plaintiff's request, a hearing before an ALJ was held on June 16, 2008, at which Plaintiff testified and a Vocational Expert (VE) testified via teleconference. (Tr. 544-579). On November 24, 2008, the ALJ issued

---

[1] At the hearing held before the ALJ on June 16, 2008, Plaintiff amended her onset date to **October 30, 2003.** (Tr. 541).

[2] According to the Administrative Law Judge (ALJ), this case has been remanded three times.

-1-

an unfavorable decision. (Tr. 10-22). The Appeals Council denied Plaintiff's request for review on April 30, 2009, and the decision of the ALJ therefore became the final decision of the Commissioner. (Tr. 5-7).

In his decision, the ALJ found that Plaintiff had the following severe impairments:

- asthma/reactive airway disease;
- mitral valve prolapse;
- coronary artery disease;
- hypothyroidism;
- bilateral knee pain; and
- bilateral shoulder pain.

(Tr. 15). However, the ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16). After carefully considering the entire record, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform a wide range of light work, with certain restrictions. (Tr. 16). More specifically, the ALJ found:

> With the use of over the counter pain medication, the claimant's pain assessment is mild with occasional moderate pain. The claimant can lift 20 pounds occasionally and 10 pounds frequently and there are not[sic] restrictions to standing and/or sitting. In addition, the claimant is limited to only occasional reaching overhead; occasional stooping, crouching, kneeling and crawling; and she cannot perform work with temperature extremes, heavy chemicals, dust, fumes or humidity.

(Tr. 16).

The ALJ found that Plaintiff was able to perform past relevant work as a General Clerk, which did not require the performance of work-related activities precluded by the Plaintiff's RFC. (Tr. 22). The ALJ therefore found that Plaintiff was not disabled. (Tr. 22 ). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and this case is before the undersigned for resolution.

**Evidence Presented**

Plaintiff was born in 1960, completed the ninth grade and received her GED. (Tr. 548-550). The 570 page transcript includes records which date back to 1998, when Plaintiff was employed at General Dynamics, making weapons for the military. While there, Plaintiff worked with aluminum powder, from which she had a toxic reaction and was unable to breathe. (Tr. 551-552). As will be more fully discussed below, Plaintiff thereafter had respiratory problems.

Plaintiff's treating physician, Dr. Joe Sarnicki, referred her to Dr. Jack Griebel, a Pulmonary Disease Physician, at the Little Rock Diagnostic Clinic, for consultation on November 5, 1999, for an asthmatic attack. (Tr. 239). Dr. Griebel's impression at that time was that Plaintiff had a history consistent with reactive airway disease syndrome following exposure to "alumina dust," with subsequent exacerbations of asthma-like attacks from exposure to non-specific irritants by Plaintiff, who was hyperreactive. (Tr. 241). Dr. Griebel next saw Plaintiff on February 8, 2002, when his impression was "[a]sthma currently under control versus reactive airways disease syndrome." (Tr. 236). On August 1, 2002, Dr. Griebel noted that Plaintiff had two episodes of exacerbation, and also that Plaintiff's pulmonary function testing showed normal large airway mechanics, mildly reduced lung volume and normal DLCO.[3] His impression was "[a]sthma currently stable, although some exacerbations have been noted." (Tr. 234).

On January 30, 2003, Plaintiff returned to Dr. Griebel for follow up of her asthma, and indicated that she was doing well with the medications - Pulmicort and Proventil - and had

---

[3]Diffusing Capacity of the Lung for Carbon Monoxide, Dorland's Illustrated Medical Dictionary, 566 (31st ed. 2007).

-3-

experienced no significant exacerbations during the last six months. (Tr. 231). Further, her chest x-ray showed no acute infiltrates and no mass lesions, and her asthma was found to be under improved control. (Tr. 231). On August 19, 2003, Plaintiff returned to Dr. Griebel and indicated that she had several episodes of exacerbation, but overall, was doing relatively well. (Tr. 228). Plaintiff was able to decrease her Albuterol nebulized use. (Tr. 228). Pulmonary function testing was obtained that same day, which showed no evidence of significant airway obstruction, very mildly decreased forced vital capacity was noted, but poor reproducibility of flow volume loop was also noted as a probable explanation. (Tr. 229). Dr. Griebel's impression was that Plaintiff's asthma was "current under stable control." (Tr. 229). On February 19, 2004, Plaintiff again saw Dr. Griebel and said that she had done very well since her previous visit, had no significant exacerbations and had not required any urgent treatments. (Tr. 420). On July 8, 2004, Plaintiff returned to Dr. Griebel for follow-up, and reported that she had done fairly well since the exacerbation that she had in mid-June, was still noting some occasional chest tightness, but overall was markedly improved. (Tr. 418). His impression was "[a]sthma; recent acute bronchitis, resolving with antibiotic and steroid course." (Tr. 418).

Another pulmonologist, Dr. Richard E. Dietzen, saw Plaintiff initially on December 23, 1999, completed a pulmonary function analysis and interpreted a sprirometry test as a "[n]ormal sprirometry." (Tr. 306). On May 1, 2000, Dr. Dietzen noted that Plaintiff had complained of breathing problems since October of 1998. At that time, Plaintiff's respiration was nonlabored, and his impression was "[a]t initial visit, probable asthma..." (Tr. 163). Dr. Dietzen further stated that peak flows suggested a confirmation of asthma, based on ariability. (Tr. 163).

On September 11, 2000, Plaintiff went to the S.E. Arkansas Pulmonary & Sleep

AO72A
(Rev. 8/82)

Disorders Clinic, where she saw Dr. Michael M. Newan for a second opinion. (Tr. 429). Her complaint was that she had episodes free of any respiratory symptoms that were mixed with episodes of having cough, shortness of breath and occasional wheezing upon exposure to perfumes, cleaning supplies and smoke. (Tr. 429). Plaintiff stated that she was doing relatively well, except when she became exposed to non-specific irritants. Dr. Newan's assessment was:

> Chronic pulmonary symptoms, especially with response to inhalation of non-specific inhalation irritants with previous history of exposure to aluminum powder which triggers the general pulmonary symptoms which again improved with avoidance of the powder and then the symptoms would get worse from exposure of spray paint which may contain Tsothiocyanate which is also a known agent that can cause occupational asthma. I do not think she has reactive airway disease since she requires a latency period about 1 or 2 months before she developed the pulmonary symptoms. Either way the prognosis and the treatment are similar since occupational asthma is an incurable disease and it can be controlled with agents. I would like to obtain a Methacholine challenge testing to see whether or not she has bronchial hyper-reactivity or not.

(Tr. 430). On September 15, 2000, a Methacholine Challenge Test was performed, which resulted in a positive Methacholine challenge testing, "indicating the presence of bronchial hyper-reactivity." (Tr. 428). On September 21, 2000, Dr. Newan found that Plaintiff's spirometry test was normal, her lungs were clear and that she had occupational asthma, with specific previous exposure to aluminum powder as the triggering event, and on that date, had bronchospasm to a non-specific agent. (Tr. 427).

On July 17, 2003, Plaintiff saw Dr. Douglas Smith at the Cornerstone Clinic and the office notes reflected that the scent of the office paper sheets caused Plaintiff nasal irritation. (Tr. 351-352).

On October 1, 2004, Plaintiff presented herself to Dr. Richard L. Boswell, of Bellevue Pulmonary Associates, P.C. (Tr. 271). Dr. Boswell noted that Plaintiff's chief complaint was

-5-

Dyspnea.[4]  He also reported that plaintiff's chest was clear.  (Tr. 271).  That same day, Plaintiff also had a normal spirometry test.  (Tr. 272).

On February 24, 2004, Dr. Trent Pierce saw Plaintiff and concluded that she had an upper respiratory infection.  (Tr. 286, 434).  He saw her again on September 28, 2004, after Plaintiff was exposed to some perfume and developed some laryngeal swelling.  She had previously presented herself to the emergency room and told Dr. Pierce that the doctors at the emergency room considered doing a tracheotomy or intubating her, but did not have to.  Plaintiff asked for a referral to a cardiologist and Dr. Pierce's exam revealed her heart to have a regular rate and rhythm.  Her lungs were clear and her pharynx was without swelling or erythema.  (Tr. 285).  Plaintiff also wanted instructions on how to use the Epipen.  On November 17, 2004, Dr. Pierce's progress notes reflected that Plaintiff had to use the Epipen the previous Monday because of some wheezing and difficulty breathing.  (Tr. 284).  She reported that when she injected herself with the Epipen, she lost consciousness.  She complained of malaise and fatigue and not feeling well.  (Tr. 284).  Her heart was regular in rate and rhythm without murmurs and her lungs were clear.  Dr. Pierce assessed Plaintiff with reactive airway disease and possible syncopal episode.  On February 15, 2005, Plaintiff saw Dr. Pierce again, with "reactive airway disease with sinusitis and bronchitis."  (Tr. 281).

On June 18, 2004, Plaintiff presented to Crittenden Memorial Hospital for shortness of breath.  (Tr. 259-264, 396-404).  The clinical impression was asthma/URI.  (Tr. 262).  An x-ray of Plaintiff's chest resulted in a finding that an infiltrate in the left lower lobe was suspected, the

---

[4]Breathlessness or shortness of breath; difficult or labored respiration.  Dorland's Illustrated Medical Dictionary,  589 (31st ed. 2007).

-6-

remaining left lung was normal, the right lung was normal, and the heart, mediastinal structures and vascularity were normal. (Tr. 269). On September 26, 2004, Plaintiff presented again to the Crittenden Memorial Hospital, when she complained of her throat swelling, trouble breathing and swallowing. (Tr. 251). The clinical impression was reactive airway disease-allergic reaction. (Tr. 252). On October 5, 2004 and November 1, 2004, Plaintiff presented to Crittenden Memorial Hospital with vocal cord dysfunction and reflux and hoarseness. (Tr. 246, 244, 245). Plaintiff was diagnosed with a small hiatal hernia. (Tr. 245).

On January 3, 2007, Plaintiff presented to Crittenden Memorial Hospital with an acute exacerbation of her asthma, and on March 14, 2007, presented again to the hospital with chest tightness. (Tr. 497). Plaintiff also presented to Emory Johns Creek Hospital in November of 2007, with Dyspnea. The possible cause was perfume odor in a hotel room.

A Physical RFC Assessment was completed by Dr. Robert Redd, a non-examining physician, on April 29, 2005. (Tr. 307-314). The primary diagnosis was reported as asthma, and Dr. Redd found that no exertional, postural, manipulative, visual or communicative limitations were established. (Tr. 307-309). With respect to environmental limitations, Dr. Redd stated that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, noting Plaintiff's asthma. (Tr. 311). He found Plaintiff to have intermittent asthma, and noted a "fume precaution." (Tr. 314).

At the hearing held before the ALJ on June 16, 2008, Plaintiff testified that she had a toxic reaction to the aluminum powder she was exposed to at General Dynamics in 1998. (Tr. 552). She stated that when she was exposed to different smells, it became very difficult to breathe and her throat closed off. (Tr. 553). She said that when this occurred, she had to use

AO72A
(Rev. 8/82)

an updraft (breathing) machine with Albuterol. (Tr. 554). She stated that she had to stay in her house to try to control the environment. (Tr. 555). She also stated that she used a Proventil inhaler and Advair inhaler and Nasacort spray, which also helped. (Tr. 558). When she went to Wal-Mart to buy groceries, she wore a mask, which helped some. (Tr. 558-559). She testified that she was kept from going to church because of the presence of perfumes and different smells. She stated that it took about 45 minutes for her to use her updraft machine and thereafter, the medication that worked with the machine made her really shaky and nervous. (Tr. 561). According to Plaintiff, sometimes it took a week to two weeks to get back to normal, depending on how bad the attack was. (Tr. 561).

**Discussion**

In one disability report, Plaintiff stated that her occupational asthma or reactive airway disease limited her ability to work. In a later disability report, Plaintiff stated that she had to keep her Epipen with her at all times as well as Benedryl, and had to wear a mask when she went out. In her function report, Plaintiff indicated that on a daily basis, she brushed her teeth, ate a bowl of cereal, read her Bible, napped, ate lunch, watched a little television, napped again, ate supper, took a bath and went to bed. (Tr. 100). She stated that she did not do house or yard work because she was too weak and short-winded. She said that she could drive, but not very much, spent time with others at her home or on the phone, and had to wear a mask when she went to church. (Tr. 104).

In his letter, Plaintiff's husband stated that Plaintiff spent at least 80% of her time inside their home, where they had a very sterile environment. (Tr. 481). He further stated that she was unable to interact with most people and lead a very isolated life, which had also caused

AO72A
(Rev. 8/82)

depression and headaches.

In his first hypothetical posed to the VE, the ALJ asked him to assume that the individual could do some occasional stooping, crouching, kneeling and crawling, and could work at the light level,[5] lifting 10 pounds or 20 pounds occasionally and 10 pounds more frequently. (Tr. 567). He further placed no restrictions on sitting, standing, or walking, and he limited overhead reaching to "occasional." (Tr. 567). He stated that he would not have this individual working outside in temperature extremes, or in heavy chemicals, heavy dust, heavy fumes, or heavy humidity. (Tr. 567). The VE responded that the individual described would be able to perform the duties of General Clerk.[6] (Tr. 568). In his second hypothetical, the ALJ asked the VE to limit the individual to sedentary activities, with all of the same restrictions, and the VE responded that the individual could perform the duties of Appointment Clerk and Telemarketer. (Tr. 568-569). Finally, the ALJ asked if there would be any jobs if the individual was homebound and unreliable for an 8 hour day or a 40 hour workweek because of the nature of her respiratory condition, to which the VE responded there would be no jobs. (Tr. 569).

Plaintiff's husband, Loren Strickland, was unable to attend the hearing, but wrote a letter dated June 17, 2008, on behalf of his wife, confirming the fact that Plaintiff's condition

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls...." 20 C.F.R. §416.967(b).

[6] The activities of a General Clerk do not include exposure to weather, extreme cold, extreme heat, atmospheric conditions, explosives, toxic caustic chemicals, or other environmental conditions. Dictionary of Occupational Titles, 1991 WL 671792, §209.562.010.

AO72A
(Rev. 8/82)

prevented her from performing normal daily activities. (Tr. 481-482). Several letters from friends were also written on Plaintiff's behalf regarding her condition. (Tr. 146-153).

In her brief, Plaintiff argues that the ALJ committed error when he concluded: that the statements made by Loren Strickland in his letter were not to be believed; that the severity of the alleged symptoms as put forth by the Plaintiff were not consistent with the objective medical evidence; and that the impairments were not sufficiently severe to declare the Plaintiff disabled under the social security regulations. The Defendant argues that the ALJ properly evaluated the medical evidence and that there is substantial evidence of record to support the Commissioner's decision.

The Court is of the opinion that this matter should be remanded to the ALJ for him to obtain a Physical RFC Assessment from one of Plaintiff's examining physicians, preferably Dr. Michael M. Newan, who interpreted the Methacholine Challenge Testing. In addition, the Court is concerned about the hypothetical question posed by the ALJ to the VE, since no mention was made relating to Plaintiff's allergic response to perfumes. Such an omission has been found to constitute a "flawed" hypothetical. See Fuller v. Barnhart, 328 F.Supp.2d 952, 957 (E.D. Ark. 2004)(holding that the hypothetical question failed to mention restrictions to perfumes or colognes or include the loss of memory and erratic behavior when Plaintiff consumed steroids). The Court therefore is of the opinion that once the ALJ receives the new Physical RFC Assessment, the ALJ should present a more appropriate hypothetical to the VE, to include a restriction to exposure to perfumes and colognes.

Based upon the foregoing, the undersigned reverses the decision of the ALJ and remands this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C.

§405(g).

IT IS SO ORDERED this 16th day of April, 2010.

*/s/ Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-11-